[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14625
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 19, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-01268-CV-AR-S

REGINA GRESHAM,

Plaintiff-Appellant,

versus

CITY OF FLORENCE, ALABAMA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 19, 2009)

Before TJOFLAT, BIRCH and WILSON, Circuit Judges.

PER CURIAM:

Regina Gresham ("Gresham") appeals the district court's grant of summary

judgment in favor of the City of Florence, Alabama ("the City"), in her employment discrimination suit under Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a), and the Equal Pay Act, 29 U.S.C. § 206(d), in which she claimed illegal demotion and disparate pay based on her gender and retaliation. On appeal, Gresham contends that: (1) she established a prima facie case of gender discrimination under Title VII and presented sufficient evidence that the City's proffered reasons for her demotion were pretextual; (2) she established a prima facie case of retaliation under Title VII because she suffered adverse actions as a result of engaging in statutorily protected expression; and (3) she established a prima facie case under the Equal Pay Act because she identified similarly situated male comparators who received higher pay than she did. Gresham's arguments do not persuade. Accordingly, we AFFIRM.

## I. BACKGROUND

On 29 June 2006, Gresham, a white female, filed a complaint against her employer, the City, and alleged gender discrimination and retaliation under Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a), and gender discrimination in compensation under the Equal Pay Act, 29 U.S.C. § 206(d). R1-1. Gresham began her employment with the City in 1985. Id. at 3. At the time of her initial employment, Jimmy Stanfield ("Stanfield"), a male, was the director of the

2

Department of Parks and Recreation.  Gresham replaced Stanfield as director in mid-February 2002.  R2-29, Exh. A at 26, 66.  At the time of Gresham's promotion, Nick Jordan was the City's mayor.  Id. at 85.  Bobby Irons ("Irons") later became mayor in October 2004.  R2-29, Exh. C at 8.  In February 2005, Irons recommended that Gresham be demoted to the position of Maintenance Supervisor.  R1-1 at 3.  Gresham exercised her right to a hearing on the matter.  Richard Meadows ("Meadows"), an Alabama attorney hired by the City for the occasion, presided.  Meadows ultimately concluded that "the greater weight of credible evidence supported the demotion," and Gresham was duly demoted.  R2-26, Exh. G at 3.

Gresham filed a complaint with the district court and alleged that the City violated her rights by demoting her and subjecting her to other disparate treatment based on gender.[1]  R1-1 at 9.  In addition, Gresham claimed that the City retaliated against her for engaging in statutorily protected activity and paid similarly situated male employees more than it paid her.  Id. at 10-13.  The City promptly filed an answer to the complaint and denied all of Gresham's allegations. R1-3.

After discovery, the City filed a motion for summary judgment. R1-24.  In

---

[1] Gresham attached to her complaint a copy of her discrimination charge filed with the United States Equal Employment Opportunity Commission ("EEOC").  R1-1, Exh. A. According to the attached copy of the EEOC determination, the EEOC could not conclude that Gresham had established a violation of the applicable statutes.  Id., Exh. B.

support of its motion, the City submitted, among other things, excerpts from Gresham's deposition, the declarations of several City employees, the declaration of Meadows, correspondence between Gresham and the City, the City's salary schedule, and a list of department heads and salary grades. R2-26, Exhs. A-G, I-K.

According to the declaration of Sandra Sockwell ("Sockwell"), the City's director of personnel, the City implemented a salary plan, developed by Auburn University, for all employees in 1986. Id., Exh. B at 2. Under the plan, each position received a salary grade based upon "factors including job duties, responsibilities, and educational requirements," but not including gender. Id. Each salary grade included five levels, or steps, of annual salary increases, and an employee new to the salary grade would usually start at Step 1. Id. at 3. The plan for supervisors and managers ("SAM plan") assigned a salary grade of VII to the head of the parks and recreation department. Id. at 2-3. Gresham's predecessor, Stanfield, retired at a salary grade of VII, Step 5. Id. at 3. In 2002, Mayor Jordan promoted Gresham to department head, with a SAM salary grade of VII, Step 1. Id. at 3-4. Gresham received step increases in 2002, 2003, and reached Step 4 in August 2004. Id. at 4. In February 2005, Gresham was demoted to maintenance supervisor, at a non-management salary grade of X. Id. In June 2005, the City hired Tina Kitchens ("Kitchens"), a female, as the new head of the parks and

4

recreation department, with a SAM salary grade of VII, Step 1.  Id.  According to Sockwell, each department head performed "unique duties," oversaw a different number of employees, and had "different responsibilities."  Id. at 4-5.  The police department had more than 100 full-time employees, and several department heads required specialized education or experience.  Id. at 5.  A sampling of the City's department heads and salary grades showed, for example, that the head of the legal department and the utilities general manager had salary grades of XIII, the head of the gas department and the mayor had salary grades of XI, the treasurer had a salary grade of IX, the fire and police chiefs had salary grades of VIII, and the head of the parks and recreation department and the personnel director had salary grades of VII.  R2-26, Exh. I.

Irons provided the following narrative in his declaration.  Id., Exh. D.  Irons took office in October 2004 and immediately reviewed the performances of all department heads, who, in accordance with City policy, served at the mayor's discretion.  Id. at 1-2.  He observed Gresham's performance, received complaints about her, and decided to recommend demoting her to maintenance supervisor.  Id. at 2.  He concluded that Gresham had ongoing performance problems after reviewing a memorandum from the previous mayor addressing some of the same issues, and he believed that Gresham was not doing an adequate job and would not

5

improve.[2] Id.

Irons related that a City employee who is demoted has a right to a due-process hearing before the demotion takes effect. Id. at 3. Although the mayor is usually the final decisionmaker, in this case the City hired Richard Meadows to conduct Gresham's hearing. Id. The City gave Meadows complete autonomy and agreed to follow his ruling, even if that resulted in Gresham retaining her position as department head. Id. at 3-4. After Gresham was demoted, Irons appointed Fed Boughner ("Boughner") as acting department head, and then hired Kitchens as the permanent department head. Id. at 4.

Addressing Gresham's allegations that he treated other managers differently,[3] Irons stated that he did not recommend disciplinary action against

---

[2] Irons provided Gresham with a detailed listing of his reasons for recommending her demotion in an 8 February 2005 memorandum. His stated rationale for the demotion was as follows: (1) continuous written complaints from parents indicating that youth athletic programs had deteriorated and were not well-managed; (2) verbal citizen complaints and Irons's personal observations that the park facilities had deteriorated and were poorly maintained; (3) numerous complaints over two and a half years about Gresham's "unwillingness to communicate and work with citizens and with certain local organizations involved in the youth sports programs"; (4) "widespread complaints from the employees" and low morale of the parks and recreation department; (5) a grievance by Gresham's secretary indicating that she was performing high-level financial and budgetary duties and drafting memoranda for Gresham, which Irons stated should be handled by Gresham or her superintendents; (6) failure to discuss issues with Irons before presenting them to the City Council; and (7) a nearly two-month delay in issuing a written report of an incident in which a City employee fired a pistol while on duty at a City park, after Sockwell repeatedly asked for the report and further documentation. Id., Exh. E at 1-4.

[3] In her complaint, Gresham alleged that male department heads with the City engaged in "far worse behavior" but were not demoted. R1-1 at 5.

6

Police Chief Rick Singleton because Singleton took immediate action to terminate two officers once he learned of their misconduct, although both officers resigned before they could be terminated. Id. at 4-5. According to Irons, Mike Doyle, head of the water department, was not disciplined because he did not violate any City policy and performed his job well. Id. at 5. Irons conceded that an audit showed that Roger Lovelace, head of the gas department, may have mismanaged the department's finances before Irons took office. Id. As a result, Irons terminated Lovelace, but agreed that he could work for six months in a non-supervisory role in exchange for Lovelace's agreement not to sue the City or request a hearing. Id. at 5-6. Finally, after learning that Jimmy Glass, head of the street department, "had made an inappropriate age related comment to an employee," Irons recommended that Glass be demoted to a non-supervisory job, which Glass accepted. Id. at 6. Irons also conceded in a later deposition that Boughner was not disciplined although a maintenance building had caught fire during his tenure as acting head of the parks and recreation department. R2-29, Exh. C at 48-49. Irons emphasized that did not ask employees to make Gresham's job harder, and that he did not recommend a demotion for Gresham because of her gender. R2-26, Exh. D at 6.

According to Boughner's declaration, he became the acting director of the parks and recreation department when Gresham was demoted, but after Kitchens

was hired, he returned to his position as superintendent, in which he supervised Gresham. Id., Exh. J at 1-2. Boughner stated that he did not discipline or reprimand Gresham in any way, and did not tell her to perform any duties that were outside of her job description or that she could not handle. Id. at 2. He never told any other employees to make Gresham's job more difficult and never asked Gresham to do anything that would cause embarrassment or humiliation. Id. Because Gresham had taken many absences since her demotion, all of which were allowed under City policy, Boughner wrote Gresham a memorandum outlining the procedures to use when requesting leave so that the department could make appropriate arrangements ("the attendance memorandum"). Id. at 2-3; see id., Exh. L. According to Boughner, the memorandum was not a reprimand. Id., exh. J at 3. The attendance memorandum simply listed the procedures for requesting leave – specifically, calling Boughner in the morning of the day Gresham needed to be absent, and then contacting "Tina" or "Gail" to request time off. Id., Exh. L. The attendance memorandum was accompanied by a copy of Gresham's attendance record. Id.

In her deposition testimony, Gresham stated that she was discriminated against because she ran one of the larger departments but had a lower pay grade than male department heads whose departments were of similar size, such as

8

Lovelace and Doyle. Id., Exh. A at 42-43. As head of the parks and recreation department, her salary was $54,910.66. Id. at 51. Gresham conceded that she did not know whether the pay scale was based on gender and she admitted that she did not have any facts to show that Stanfield, in particular, made more money than she did based on gender. Id. at 77.

Gresham further testified in her deposition that, at her due process hearing, she was represented by counsel, who had the opportunity to question witnesses and present her position. Id. at 78-81. Although Gresham had no personal knowledge that Doyle was involved in an inappropriate workplace relationship, she nonetheless asserted that there was misconduct by Doyle, Lovelace, and other department heads – none of whom were demoted – and any misconduct by her or her department was minor in comparison. Id. at 137-40. Gresham claimed that Police Chief Singleton and others had internal problems that were worse than hers, but they were given the opportunity to address them, and she was not. Id. at 260-62.

Regarding her retaliation claim, Gresham stated that the attendance memorandum issued by Boughner was retaliatory because (1) she had had a "near perfect record" before taking medical leave, (2) she was the only one who received the memorandum, (3) the City may have been building a file against her, and (4) it

9

caused her stress to have an unfounded document in her file. Id. at 159-60, 174-76. Gresham also claimed that her post-demotion work assignments were retaliatory in nature. Id. at 159, 191-196. Gresham stated that she was never reprimanded in her new job because she did not have any responsibilities, which, in turn, caused resentment from other workers who wanted her position. Id. at 183, 187, 193, 202-03. According to Gresham, Boughner retaliated against her by asking her to mow grass in a high-visibility area, knowing that such work would be embarrassing for her as a former department head. Id. at 191-95. She did not actually mow the grass in a high-visibility area, but merely being asked to do so was embarrassing, and she believed Irons told Boughner to try to get her to resign. Id. at 196-97. Finally, Gresham acknowledged that Irons assigned her to the new position before she filed her EEOC charge. Id. at 204.

Regarding her claim of disparate pay, Gresham acknowledged at her deposition that the departments had "different responsibilities, different numbers of employees to supervise, [and] different job duties." Id. at 229. Although several male department heads were paid less than she was, she nevertheless claimed that she should have had a salary grade of VIII like the fire and police chiefs because her job was as just as important. Id. at 232, 235. Gresham stated that Irons hired a female replacement for her – Kitchens – only to prevent a lawsuit. Id. at 244-47.

10

In response to the motion for summary judgment, Gresham submitted, <u>inter alia</u>, transcripts from her deposition, her due process hearing, and Irons's deposition. R2-29, Exhs. A-C. In her deposition, Gresham testified that, after her demotion, Rory Hunt told her that Irons had questioned him because Irons had heard from Ray Jordan, a park ranger, that Gresham had recommended that the maintenance employees file a class action lawsuit against the City for placing her in a position for which they were qualified and she was not. <u>Id.</u>, Exh. A at 208-09. Gresham conceded telling the employees that they should file a lawsuit and went on to state that the park rangers used to tell her that Ray Jordan, also a park ranger, would brag to them that Irons was him asking questions about Gresham. <u>Id.</u> at 209-10, 308.

Gresham also attempted to rebut the Irons's contention that she failed to discuss issues with him before presenting them to the City Council. According to the transcript from the due process hearing, Irons stated that Gresham had appeared at a City Council meeting with a high school student who wanted to build a playground at one of the parks, but Gresham had not cleared the project through him first. <u>Id.</u>, Exh. B at 94-95. The mayor acknowledged that Gresham may have mentioned the project "just casually in earlier conversation." <u>Id.</u> at 97. Gresham stated that she had mentioned the playground project to the mayor and that the

11

student was an honor student who wanted to attend a "work session" and report on his project "for informational purposes only." Id. at 197-98. Gresham claimed that the whole incident was "blown out of proportion." Id. at 197.

The case was sent to a magistrate judge who issued a report and recommendation. R1-31. Regarding Gresham's Title VII claim of gender discrimination based on her demotion, the magistrate judge found that it was undisputed that Gresham was a member of a protected class, was qualified for the position of head of the parks and recreation department, and suffered an adverse employment action. Id. at 25. The magistrate judge concluded, however, that Gresham did not establish a prima facie case of discrimination because she did not show that (1) she was replaced by someone outside the protected class, or (2) male department heads engaged in substantially similar conduct and were not demoted. Id. at 25-27, 30. The magistrate judge distinguished Gresham's conduct from that of Doyle, Lovelace, Singleton, and Boughner, and found that there was no indication that the City considered Gresham's conduct to be similar to that of the others. Id. at 27-30. In addition, the magistrate judge found no evidence to suggest that the mayor considered Gresham's conduct less serious, and even if the mayor was wrong in his assessment, there was no evidence that his decision was motivated by discrimination. Id. at 28. The magistrate judge also noted that male

12

department heads and employees had been disciplined.  Id. at 28-30.  He concluded that Gresham had not shown that the male department heads had engaged in "nearly identical" conduct.  Id. at 29.

Moreover, the magistrate judge also found that, even if Gresham established a prima facie case of discrimination, she did not present evidence of pretext.  Id. at 30-34.  In particular, the magistrate judge found that, although Gresham challenged the mayor's conclusions about her performance, there was no evidence to suggest that the mayor was actually motivated by gender discrimination and no evidence that Meadows, an independent hearing officer, followed a discriminatory recommendation of the mayor.  Id. at 32, 34.

With regard to Gresham's retaliation claim, the magistrate judge concluded that her demotion "preceded any alleged protected expression" because Gresham did not indicate that she would assert a discrimination claim in her request for a due process hearing or at the hearing.  Id. at 35.  He found that Gresham was unable to show any "materially adverse conditions of employment" that occurred after her 11 July 2005 EEOC complaint.  Id. at 36-37.  In particular, the magistrate stated that: (1) the duties and conditions of her maintenance supervisor position were in place before she filed the EEOC charge; and (2) the only actions that could have been retaliatory after that time were the mayor's questioning of other

13

employees and the attendance memorandum, and the circumstances of these actions did not create an inference of retaliation. Id.

Finally, with regard to Gresham's Equal Pay Act claim, the magistrate judge found that Gresham had "failed to prove that similarly situated comparators outside the protected class received higher compensation than she did." Id. at 38. The magistrate judge determined that: (1) Gresham and her predecessor had the same job classification and salary range, and both received step increases on schedule; and (2) no evidence suggested that the classification of the parks department was gender-based. Id. at 37. Gresham objected to the report and recommendation but the district court adopted the magistrate judge's findings and recommendation, granted summary judgment for the City, and dismissed Gresham's complaint with prejudice. R1-36.

## II. DISCUSSION

We review de novo the district court's grant of summary judgment, "view[ing] all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party." Burton v. Tampa Hous. Auth., 271 F.3d 1274, 1276-77 (11th Cir. 2001). "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any

14

material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (quotation marks omitted).

A. Title VII Gender Discrimination

Gresham argues that the City's male department heads had more serious problems in their departments than she did, but were not demoted. She further argues that the City's proffered reason for her demotion, a combination of complaints, was pretextual.

Title VII prohibits employers from engaging in practices that discriminate on the basis of gender. 42 U.S.C. § 2000e-2(a). Absent direct evidence of an employer's discriminatory motive, a plaintiff may establish her case through circumstantial evidence, using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). Under this framework, the plaintiff may establish a prima facie case of gender discrimination by showing that she "was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." Id. In Holifield v. Reno, we recognized that "[i]f a plaintiff fails to show the existence of a similarly situated

15

employee, summary judgment is appropriate where no other evidence of discrimination is present." 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam).

Once the employee establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its treatment of the employee. Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). If the employer articulates such a reason, the burden shifts to the employee to "proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual." Id. at 1024-25. "A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation marks and citation omitted). The plaintiff can meet her burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. (quotation marks and citation omitted). To discredit the employer's explanation, the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find all of those reasons unworthy of credence." Watkins v.

16

Sverdrup Tech., Inc., 153 F.3d 1308, 1314 (11th Cir. 1998) (quotation marks, citation, and alteration omitted).

Upon review of the record and the briefs of the parties, and assuming without deciding that Gresham established a prima facie case, we conclude that Gresham has not shown that all of the City's stated reasons for her demotion were so weak or contradictory that a reasonable factfinder could find all of them unworthy of credence. In addition, she has not pointed to sufficient evidence that would tend to show that discrimination was the real reason for her demotion. Accordingly, we conclude that Gresham failed to establish that the City's stated reasons were pretextual.

B. Retaliation

Gresham argues that her first act protected under Title VII was a demand letter to the City stating that she was making a charge of discrimination. She also argues that the conditions of her new job after her demotion were adverse actions that were retaliatory in nature.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529

17

F.3d 961, 970 (11th Cir. 2008). As to the first prong, statutorily protected expression includes internal complaints of discrimination to supervisors and complaints lodged with the EEOC. 42 U.S.C. § 2000e-3(a); Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001). As to the second prong, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006). To establish the third prong, a causal connection, a plaintiff must show that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir.) (quotation marks, citation and alterations omitted), cert. denied, 129 S. Ct. 404 (2008).

Our review of the record reveals no evidence that the conditions of Gresham's new job were either materially adverse actions or that they resulted from her demand letter. Accordingly, she has not established a prima facie case of retaliation.

C. Equal Pay Act

Gresham contends that other City department heads are valid comparators. She argues that out of the City's twenty-three department heads in 2005, only four

18

were women, and all of the women had salaries in the lower half of the pay scale.

The Equal Pay Act prohibits sex-based discrimination in compensation and provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

In evaluating a claim under the Equal Pay Act,

> [o]nly the skills and qualifications actually needed to perform the jobs are considered.  Comparators' prior experience is not relevant to the substantially similar inquiry.  The examination also rests on primary, as opposed to incidental or insubstantial job duties.  Job titles are a factor for consideration, but are not dispositive.  The plaintiff need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety.  Nonetheless, in EPA cases the standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high.

Mulhall v. Advance Sec., Inc., 19 F.3d 586, 592 (11th Cir. 1994) (quotations

marks, alteration, and citations omitted).

In this case, Gresham has presented insufficient evidence to show that the City's higher-paid department heads were valid comparators. Moreover, the record shows that the City's pay scale was determined based on factors other than gender. Accordingly, Gresham has failed to establish a prima facie case under the Equal Pay Act.

## III. CONCLUSION

Gresham appeals the district court's grant of summary judgment in favor of the City. After careful consideration of the record and the parties' briefs, we conclude that Gresham did not meet her burden of establishing a prima facie case of retaliation under Title VII or of establishing a prima facie case under the Equal Pay Act. As regards gender discrimination claim, we find that Gresham failed to establish that the City's stated reasons for her demotion were pretextual. Accordingly, we AFFIRM.